THE STATE ex rel. SPENCE v. THE JUDGE OF THE NINTH JUDICIAL CIRCUIT.

1. In the case of a contested election, the circuit judge, under the act of 1840, acts as the returning officer, although he is clothed with power to re-examine and recount the votes, and to reject such as are illegal. and a *mandamus* will lie to compel him to give a certificate of election to the party legally elected, when it is withheld by the judge from him.

2. The word " Pence," was written on a ticket, cast at an election for sheriff. at which *Spence* was a candidate. On counting out the votes, the

The State ex rel. Spence v. The Judge of 9th Judicial Circuit.

managers called in the voter, who declared that he did not intend to vote in the sheriff's election, and therefore wrote the word "Pence" on his ticket. Held, that it was properly rejected by the managers.

3. When a vote is improperly rejected by the managers of an election, upon a contest before the circuit judge, he has not the power to consider the vote as cast for the candidate, whom the voter declares he intended to vote for. But if the improper refusal to permit the vote to be cast changed the result, the election should be declared void.

4. One who considers Talladega county as his place of residence, and remains in Wetumpka during the winter, or business season, and declares that he never intended to abandon his residence in Talladega, is qualified to vote in that county.

5. When by birth, or residence, one has acquired a fixed domicil, a temporary absence, on business or pleasure, with the intention of returning, and an actual return, in accordance with such intention, will not work a change of the domicil.

6. The ballots, or votes themselves, are higher evidence of the number of votes cast, than the certified lists of the votes sent by the managers at each precinct, to the managers at the court house, and if either party received more votes than were counted for him, the circuit judge should correct the mistake, and count the votes.

7. If the managers at an election are legally appointed, and duly qualified to act, the right of one elected cannot be impaired by the neglect or omission of the managers, in preserving the votes after the election is over, in the manner prescribed by the statute. The statute prescribing the mode in which the ballots shall be preserved after the election is dirctory merely.

8. When the ballot box of a piecinct is found to contain six more votes than were returned by the managers, for one of the candidates; when two of the managers swear that they believe he received more votes than were counted for him, and certified to the managers at the court house, and there is no proof that the additional votes were fraudulently inserted in the ballot box, after the election, the circuit judge should allow them.

9. A mandamus will not lie when the party applying for it has no specific right, either legal or equitable. It will not lie to require a judge of the circuit court to declare an election void.

Before the Hon G. W. Stone.

SOLOMON SPENCE at a previous day of this term, filed his petition, in which he represented, that at the last August election, he was duly elected sheriff of Talladega county, receiving 711 votes, Josiah Terry receiving 709 votes, and Givens 343 votes. That after the returns of the election were made, and the result was announced, Josiah Terry no-

tified the petitioner, that he intended to contest the election, before the Hon George W. Stone, judge of the 9th judicial circuit, upon the grounds—1. That he, Terry, had received a plurality of the legal votes cast at the election. 2. That mistakes had occurred in counting the votes, prejudicial to the said Terry. On the 10th of November, 1847, the circuit judge proceeded to examine and recount the ballots cast at the election, and to reject those he deemed illegal. That the circuit judge, on such examination and recount of the votes, admitted and counted the votes given at several precincts, which the petition avers were illegal, to wit: the votes polled at Hendricks's precinct; the votes polled at Rhinehart's precinct, and at Mardisville. That those votes were illegal—1. Because the numbers on the ballots were compared with the numbers on the list of votes, by the managers at the election, and by certain persons after the election. 2. Because the oath prescribed by law was not administered to the managers of the election, nor to the returning officer. 3. That the ballot boxes were not preserved, and returned to the judge, in the manner prescribed by law. 4. Because the ballots given at Rivers' precinct were opened and examined after the election was closed.

The petition further alledges, that upon the re-count of the votes, the circuit judge rejected as illegal the votes of James Hanson, Job S. Waites, Jesse Blassingame, and William Mason, who voted for the petitioner; and also refused to count the vote of Richard Smoot, who had offered to vote for the petitioner, but was rejected by the managers. That the circuit judge counted for Terry, the votes of James T. Hurst, Robert Houston, and John Johnson, which the petitioner alledges were illegal; but that the votes of Norton, Shelly, McCattery, Harrall, and William Easly, were rejected by the judge as illegal, and which had been cast for Terry.

The petition further alledges, that the circuit judge declared the result of the election to be, that Josiah Terry was elected by two votes, and gave to Terry a certificate of election, and refused to give a certificate of election to the petitioner.

808       **ALABAMA.**

The State ex rel. Spence v. The Judge of 9th Judicial Circuit.

The petition concludes with a prayer, that a mandamus be awarded to the said circuit judge, requiring him to issue certificate of election to the office of sheriff of Talladega county to the petitioner, and also for general relief.

Upon this petition, a rule *nisi* was made on the circuit judge, requiring him to show cause why a mandamus should not be issued; to which rule the circuit judge returned—that Terry, the contestant, sought by a re-count of the ballots, and by rejecting certain votes, he alledged to be illegal to be declared sheriff. That Spence, who had been declared sheriff, resisted the re-count, because the first was correct, and that the ballots had been kept so carelessly since the election, that no reliance could be placed on their accuracy; and because the election had been held in such an illegal manner, that it was void. That the returns of the managers shows, that Spence received ...... ...... ...... ...... 711 votes.
That Terry received ...... ...... ...... ...... 709

Making Spence's majority ...... ...... ...... 2

Upon a recount of the votes, he found that Terry had received six votes at Hendricks's precinct that had not been counted for him—thus giving Terry a majority of four votes, as shown by the tickets returned from that precinct. He rejected the votes of James Hanson, Jesse Blassingame, and John S. Waits, and also a vote that had written upon it *Pence*, which had not been counted by the managers. He rejected as illegal, the votes G. G. Norton, Geo. N. Shelly, John McCattery, John B. Harrell, and Wm. Easly, the sheriff of the county, who had voted for Terry.

The six votes given at Hendricks's and not counted, gave Terry a majority of four—three votes given for Spence, and which had been counted by the managers, but by him rejected, swelled Terry's majority to seven—and deducting five votes given to Terry, and by him rejected, reduced the majority of Terry to two—and therefore he gave said Terry a certificate of election.

The return then sets out the names of all the persons whose votes were contested, and refers to the evidence on which they were admitted or rejected.

After this return was made, the judge made an additional

JANUARY TERM, 1848. 809

The State ex rel. Spence v. The Judge of 9th Judicial Circuit.

return, that he procured the lists sent by the managers from Hendricks' precinct, to the managers at the court house, and compared it with the list in the ballot box, and the votes in it, and found that they corresponded.

HOPKINS and MORGAN, for the motion.
RICE and PARSONS, contra.

DARGAN, J.—The circuit judge, in the exercise of the powers conferred on him by the act of 1840, prescribing the manner in which elections for sheriffs and clerks shall be contested, acts as the supervisor of the election, or the returning officer, for the purpose of advising the executive, whether the election is legal or illegal; and if legal, who was elected, in order that a commission may issue to him. In exercising these powers, he does not set as a judge pronouncing definitively on the rights of the opposing candidates to the office. See The State ex. rel. Thompson v. The Circuit Court Judge of Mobile, 9 Ala. Rep. 338; Womack v. Holloway, 2 Ala. Rep, 31. In this case the election was held—Spence was declared elected by the managers—it was contested in the mode prescribed by the act—and the circuit judge certified that Terry was elected. The first question therefore presented is, will a mandamus issue to the managers, or supervisors, of an election in favor of the party elected, if they have given a certificate of election to one not elected? In the case of Rix as the Mayor of York, Mr. Withers moved for a mandamus to have the corporate seal put to his certificate of election, alledging that he was duly elected recorder. This was apposed by the corporation, on the ground that Sinclair had received a majority of the votes at the election, and was duly declared elected, upon which the corporation certified his election to the secretary of state, that the king might approve of him. The rule was granted, and on the return, it appearing that Withers, and not Sinclair, had received a majority of the legal votes, a mandamus was awarded. See 4 Durnford & East Rep. 699, 5 vol. 66. And in the case of Strong, 20 Pickering, 484, it was held, that a mandamus would lie to the board of examiners, to compel

102

them to give the petitioner a certificate of election, he having been elected a county commissioner, although the board of examiners refused to give him a certificate, and had ordered a new election, at which another individual had been elected; and they had given to him a certificate of election. These cases show, that a mandamus will lie to the managers of an election, to compel them to give a certificate of election to the party elected.

The office the petitioner claims, is that of sheriff of Talladega county, and we have seen that the circuit judge, in the exercise of the powers conferred by the act of 1840, acts as the returning officer, or manager of the election; clothed it is true, with the power to re-examine, and re-count the votes, and to reject such as are illegal. Yet his acts are not judicial, nor conclusively binding on the rights of the parties. This being the character in which he acts, a mandamus will lie, to compel him to give a certificate of election to the office of sheriff, or clerk, to the party legally elected, when it is withheld by the judge from him. See the case in 9 Ala. R. 338.

It then becomes necessary to ascertain in the first place, if Spence was duly elected sheriff of Talladega county. He was declared elected by a majority of two votes—Terry contested his election before the circuit judge—the votes were recounted by him, and evidence was taken by both parties to show that illegal votes had been given, and also to show, that the election had not been legally held at several precincts. The circuit judge pronounced, that Terry was elected, and in his return to the rule which was heretofore granted, he states, that he found in the ballot box at Hendricks' precinct, for Terry, six more votes than had been counted for him by the managers, and after rejecting all the votes shown to be illegal, whether given for Terry or Spence, that those six votes gave Terry a majority of two votes. He also states in his return, the votes he deemed illegal, and which were by him rejected, and the evidence upon which he judged them illegal. Also, the votes that each party contended were illegal, but which were allowed by him as legal votes, and the evidence produced to show their illegality,

and by his return places the whole evidence introduced before him, before this court.

The votes actually given at the election, the legality, of which is contested, are fourteen in number. Of these six were given for Spence; James Hanson, Thomas Waites, Jesse Blassingame, John Lienbaugh, John Shannin, and John Bonner. Smoot offered to vote at the election, but his vote was not received, and he would have voted for Spence. On Mason's vote, the word Pence was written, but this was rejected by the managers of the election, at which the vote was given, because he declared, when called on by the managers in counting the votes, that he did not intend to vote for sheriff at all. Of the votes contested, that were cast for Spence, three were rejected by the presiding judge—James Hanson, jr., Thomas Waites, and Jesse Blassingame.

The evidence is conclusive to show, that neither Hanson, nor Waites were twenty-one years old. These two votes were therefore properly rejected. But we think that Blassingame was a legally qualified voter ; he came to the county of Talladega in 1845, and lived with his grandfather until some time in 1846, when he volunteered and went to Mexico. He returned to Talladega in May or June, 1847, and still continues to reside with his grandfather—although it is shown that his father resides in Marshall county, it is not shown that the voter had any other residence than in the county of Talladega, or that he claimed any other. It may be fairly inferred that the voter considered Talladega as the county of his residence, and his grandfather's as his house; his vote therefore should not have been rejected. It is contended, that the vote of Mason, on which was written the word Pence, should have been counted for Solomon Spence. The testimony shows, that the managers of the precinct where it was given, on the evening of the day of the election, on counting out the votes, called on the voter to know if he intended by it to vote for Spence. He then stated he did not, that he did not intend to vote for sheriff at all, and therefore had written on his ticket the word Pence. After this declaration, made by the voter, we think the managers properly refused to count this vote.

It is perhaps unnecessary to inquire whether the mana-

gers should have have permitted Smoot to vote, or not, for he did not vote, and even if his vote could have had any influence in changing the result of the election, as in fact it was not given, it could only have authorized the circuit judge to have declared the election void, but could not authorize him to count it as a vote actually given for Spence. But we incline to the belief, that the managers properly refused his vote; his place of business was at Wetumpka, in Coosa county, where he spent the most of his time; he had no residence in Talladega county, but his children remained with his brother, in Talladega, where the voter spent usually several months during the summer. But whether he was a qualified voter or not, as his vote was not given, his offer to vote could only set aside the election, if the vote would have changed the result; and therefore could not authorize the circuit judge to give to Spence a certificate of election, and he must show that he is entitled to a certificate of election, before the mandamus can be awarded.

The managers at the court house certified, that Solomon Spence received 711 votes; the circuit judge rejected three cast for him, when he should have rejected only two; this would give Spence 709. Terry received, according to the returns of the managers at the court house, 709—eight of which are contested as illegal, five of these eight were rejected by the circuit judge as illegal, to wit: the votes of Norton, Shelly, McCattery, Harrell, and William B. Easley, the sheriff of the county; and three were allowed as legal voters, to wit: the votes of J. F. Hunt, Robert Houston, and John Johnson. The testimony of Shelly shows, that Talladega had been the county of his residence; that in the fall of 1845 he went to Wetumpka, with the intention of remaining during the business season, and then of returning to Talladega; that he has always considered Talladega as the county of his residence, and only intended remaining in Wetumpka during the winter, or business season; that in May, 1846, he returned to Talladega, and joined a volunteer company raised in that county, and went to Mexico; he returned to Talladega in May or June, 1847, and has resided in that county ever since, and never has intended to abandon his residence in Talladega county. His testimony is not contra-

dicted by any witness; we therefore think that he was a qualified voter, and the circuit judge should not have rejected his vote.

Harrell's vote is also a legal vote; he had been raised in Talladega county, and resided with his mother until the year 1847. He went to Coosa county and taught school three months, but never intended to abandon his residence. He returned to Talladega, a month or two before the election, where he still resides; certainly his absence from Talladega for a few months, on business, without any intention of becoming a citizen of any other county, or of abandoning his residence in Talladega, cannot deprive him of the political rights of a citizen of Talladega county. The circuit judge should not have rejected his vote. When a man has acquired a domicil by birth, or residence in one county, and goes to another county, or country, the question whether he has changed his domicil, depends mainly on the fact, whether his new residence is temporary or permanent—whether for the purpose of accomplishing a temporary object, or whether he intends it as his fixed abode. If the departure from one's fixed abode is for a purpose in its nature temporary, whether on business or pleasure, accompanied with the intention of returning, and he does return, without having altered his intention during his absence, such a departure, or absence from his domicil, will not deprive him of any of his rights, civil or political. See 1 Metc. Rep. 250; also, Knox v. Watmaugh, 3 Greenl. R. 455.

Having ascertained that these two votes should have been allowed for Terry, it is unnecessary to examine the legality of each vote any farther. We will not therefore determine whether Easley, the sheriff of the county was entitled to vote, or whether any other of the eight contested votes for Terry were legal or not; for if Terry is entitled to the six additional votes found in the box for him at Hendricks' precinct, then Spence did not receive a majority of the legal votes given at the election.

It is contended that the evidence shows that these additional six votes should not be allowed for Terry. The evidence is, the return of the managers, showing that Terry received fifty-two votes, also, Joshua B. Starns, who acted as

one of the clerks, states, that he and Lewis were clerks of the election at this precinct; he thinks that the clerks compared their list after the result was ascertained, and thought at the time it was done, that the return sent to the managers at the court house was correct. That the managers sent one of the lists kept by the clerks, showing the result of the election at the precinct as their official return. The managers were Hendricks, Pyles and Bunt. Pyles, one of the managers, states, that it was his impression, from the tally sheets that were kept in counting out the votes, that Terry received at the precinct fifty-seven votes, and came to this conclusion from the fact, that other tally sheets were kept, and they all agree, that Terry received fifty-seven votes, except the one sent up as the official return to the court house, and this was kept by Lewis, who was one of the clerks. After the election was over, Hendricks, one of the managers, took charge of the ballots, or votes. They were not sealed up in his presence, but the ballot box was tied up with a string, in which the ballots were placed. The day before, the witness and Hendricks started with the ballot box to hand it to the circuit judge: Hendricks and himself took out from the box the list of the voters, to ascertain if particular persons had voted at that precinct; they returned the list of voters into the box, then nailed it up, and brought it to the judge. The ballot box was in the same condition when delivered to the circuit judge, that it was, when delivered to Hendricks, one of the managers, to keep, except that it was nailed up when they started with it, to deliver it to the judge. Bunt, another manager states, that the clerk kept two lists; he supposed they were correct. That one was sent to the court house, or to the sheriff, but does not think it contained the correct number of votes given for Terry at that precinct; for he thinks Terry received at that precinct fifty-seven votes. That the list kept by Starns, one of the clerks, and all the others agree in giving Terry fifty-seven votes. Mr. Lewis was the other clerk, and his list was certified to the managers at the court house. The witness did not examine the list kept by Lewis, but supposed they agreed; the clerks at the time spoke as if they agreed. The ballot box, with the ballots enclosed, was handed to Hendricks to be kept after the

election.　George W. Johnson states, that he examined the clerks' list, on the evening of the election, and that Terry received, according to the list, fifty-two votes.　This is all the evidence, touching the number of votes Terry received at that precinct.

It is certainly true that the ballots, or votes themselves, are higher evidence than the certified lists, or number of votes sent by the managers at each precinct, to the managers at the court house, and if either party received more votes than were counted for him by the managers, the judge would correct this mistake, and count for each party all the votes given for him, even if they were not correctly numbered by the managers, on the day of the election.　See 9 Ala. Rep. 338. This we do not understand to be contested, but it is said, that the ballots were not "*sealed up and secured*" as the statute directs; and on the contrary, the box has been opened, and the list of voters examined that was in the box, between the election and the time of the examination by the judge.

We think it beyond doubt true, that it is the election that entitles the party to the office, and if one is legally elected to an office, by receiving a majority of legal votes, the managers at the time of the election being legally appointed, and duly qualified to act as such, his rights to the office ought not to be divested by any omission of the managers, after it is held, or negligence on their part in not preserving the votes in the manner prescribed by the statute.　It might be asked, if the managers could divest the right of the party elected, by any act whatever, if he were able to show that he was duly elected.　The rule that has obtained, not only in the congress of the United States, but also in some of the legislatures of the States, is, that if the votes are legal, and the officers appointed to conduct the election are properly qualified, then omission, or neglect to make return within the time, or according to the mode prescribed by the legislature, does not vitiate the election, nor divest the title of the successful candidate to the office.　In the matter of the contested election, between Van Rensselaer and Allen, one of the irregularities complained of was, that after the election, the ballot box was tied with tape, and not locked as required by the law of New

York. Yet it was decided by the house of representatives of the United States, that this omission, after the election, did not vitiate it, or entitle the party contesting to reject the votes given in at this poll. This decision was made in 1793, and has been the rule recognized by that body ever since. They look to the qualification of the voter, and the officers who held the election, and do not permit the omissions, or neglect of the managers, after the election is over, to control its result. And we think this the correct rule, and that the statutes prescribing the mode in which the ballots shall be preserved after the election, is directory. And although it is highly important that they should be observed, yet if the managers fail in this respect to do their duty, the right to the office, if it can be ascertained correctly, is not to be divested by *such omissions*.

Having attained this conclusion, the next inquiry is, did Terry actually receive six votes more at Hendricks's precinct, than were counted for him by the managers. Six were found in the ballot box, and it is not shown that there were more votes or ballots found in the box, than there were voters, according to the list of voters. It is not shown that these six votes were surreptitiously placed in the box; indeed, two of the managers swear, that they believe he received more than were counted for him, and certified to the managers at the court house; and Lewis, whose list or tally was certified, has not been examined. Starns, the other clerk, only says, that he thought at the time, that his list agreed with that of the other clerk. Under this proof, and in the absence of all proof that these six additional votes for Terry were fraudulently inserted into the ballot box, after the election was over, we cannot come to the conclusion that they should be rejected, but on the contrary, think that the circuit judge properly allowed them for Terry.

It is then certain, that Spence was not elected sheriff, and therefore he is not entitled to a certificate of election to that office. But it is contended, that the testimony shows, that at *Rhinehart's precinct*, where Terry received a large majority, the managers were not sworn at all, and hence the votes at this precinct should be rejected, and the election declared void, for it is contended, that to make the election

The State ex rel. Spence v. The Judge of 9th Judicial Circuit.

legal, the managers or officers appointed to hold and conduct it, must be qualified, and sworn according to the directions of the statute; and if they are not, that the votes cast at the precinct at which they were appointed to preside as managers, must be rejected; and if the vote at Rhinehart's be rejected on this account, the election should have been declared illegal and void, and so certified to the Governor by the circuit judge. If we admit that the circuit judge should have declared the election void, because the vote at Rhinehart's not only changes the result, but as the managers were not sworn, the election at that precinct is illegal; but on this question we express no opinion. The question will then recur, does the writ of mandamus lie, not to compel the circuit judge to grant to the applicant a certificate of election, but to compel him to declare the election void, after he has revised it under the act of 1840, and granted a certificate of election to one of the opposing candidates. It is very clear, that the writ would be awarded to compel the judge to grant to the applicant a certificate of election, had he shown that he was elected, but as this is not shown, will the writ, at his motion, be awarded, to have the election declared void?

The writ of *mandamus* will only be granted when there is a specific legal right, and there is no adequate legal remedy to enforce it. See 1 Ala. Rep. 15. If the right of the party applying for the writ, be merely equitable, the writ will not be granted. See The King v. The Managers of Stafford, 3 Term Rep. 651. And *a fortiori* it will not be granted, when the party applying for it, has no specific right, either legal or equitable. In the case of The King v. The Abp. of Canterbury, 8 East, 219, Lord Ellenborough said, in all cases there ought to be shown a clear specific right, as well as the want of a' specific legal remedy, before the writ can be granted; and as the applicant did not show any legal right which he claimed, more than was possessed by any other of his majesty's subjects, the writ could not be granted.

Spence not being elected, what specific right has he, in

103

the office of sheriff of Talladega county, more than any other
citizen, or legal voter of that county ?    The answer can only
be, he has none.   He therefore has failed to show a clear
specific legal right, and the writ cannot be granted.

Let the rule heretofore granted, be discharged.

CHILTON, J., not sitting.