## GRIFFIN vs. WALL.

[IN MATTER OF CONTESTED SHERIFF'S ELECTION.]

1. *Trial on appeal to circuit court not de novo.*—In case of a contested election, removed by appeal from the probate to the circuit court, (Code, §§ 300–338,) the cause should be tried on the record alone, and not *de novo.*

2. *Statement of grounds of contest, and notice of votes illegally received or rejected.* An averment in the statement, contesting a sheriff's election, that A. B. " was the successful candidate," is equivalent to an averment that he had been " declared elected ; " and if the statement is accompanied by a list of the names of the voters whose votes were illegally received or rejected, it is a sufficient compliance with the requisitions of the statute, (Code, § 277,) so far as the contestant is concerned.

3. *Counter notice, when necessary.*—If the party whose election is contested desires to offer evidence of votes for himself which were illegally rejected, or votes for his opponent which were illegally received, he must serve a notice of the names of such voters, similar to that which is required of the contesting party, (Code, § 277 ;) otherwise, he can only adduce rebutting evidence as to the votes specified in the contestant's notice.

4. *Error without injury in not requiring counter notice.*—The contesting party cannot complain on error of the refusal of the probate judge to require his opponent to give counter notice of votes illegally received or rejected, when it appears from the record that the probate judge, in recounting the votes, did not reject any vote which had been cast for the contestant, nor receive and count any vote for his opponent which had been rejected.

5. *Plea unnecessary.*—It is not necessary that the person whose election is contested should file a plea to the statement.

6. *Examination of poll-lists and ballots, and effect as evidence.*—It is the duty of the probate judge to receive any legal evidence of errors or mistakes in either the poll-lists or ballots. but to be controlled by them if unexplained ; and if there remains an irreconcilable conflict between the number of voters and the ballots, after all the testimony has been heard, the number of votes shown by the poll-lists is entitled to more credit than the unexplained number of ballots found in the box.

7. *Injury presumed from error.*—When the record does not show the number of votes found for either party on the final recounting by the probate judge, the appellate court cannot intend that the counting of illegal votes for the party declared elected was an error harmless to the contestant, but must presume injury from the error.

8. *Domicile of voter as affected by change of residence.*—If a voter goes to another county, for a temporary purpose only, and with the intention of returning, this does not work a change of domicile, nor a forfeiture of his right to vote in his own county.

9. *Impeaching witness.*—A party cannot be allowed to impeach a witness introduced by himself.

10. *Proof of domicile by reputation and declarations.*—A party's present or former residence cannot be proved by reputation, or common report ; nor are his declarations competent evidence to prove his former place of residence, when the question arises in a controversy between third persons ; but the declarations of a party on leaving home, or immediately previous thereto, or while on a journey, explanatory of the act or object of leaving home or performing such journey, are competent evidence, on the principle of *res gestœ*, whenever the act itself is material.

11. *Judgment reversed and rendered.*—In reversing the decision of the circuit court, affirming the judgment of the probate judge in a contested election case, the appellate court will itself render the judgment which the circuit court ought to have rendered, whenever the record enables it to do so.

APPEAL from the Circuit Court of Coosa.
Tried before the Hon. C. W. RAPIER.

IN this case, the election of Thomas T. Wall to the sheriffalty of Coosa county was contested by David A. Griffin, an opposing candidate, who filed in the office of the probate judge, on the 21st August, 1857, a written statement containing the following allegations : That the election for sheriff of said county was had on Monday, the 3d day of August, 1857, said Wall and Griffin being the opposing candidates ; "that fraud and malconduct intervened at said election, on the part of certain inspectors and clerks, at the following precincts : No. 1, Wetumpka ; No. 3, or Lee's precinct ; No. 5, or Nixburg precinct ; No. 6, or Rockford precinct ; No. 7, or Traveler's-rest precinct ; and No. 9, or Adkins' precinct ;". "that the said frauds at precincts Nos. 1, 5, 6 and 9 consisted in counting more votes for Thomas T. Wall, the successful candidate, than he received, and so certifying upon the poll-list sent up or returned to the sheriff of said county ; that the fraud at precincts Nos. 3 and 7, and also in part

at No. 6, consisted in not counting for petitioner the number of votes which he received, and which should have been counted for him; " "that a number of illegal votes were received and counted for said Wall, which, if taken from him, will reduce the number of his legal votes below the number of legal votes received by petitioner; and that certain legal votes were rejected at said election, lists of which legal and illegal votes are hereunto appended."

The statement, or petition, was verified by the affidavit of the contestant, to the effect "that the facts and statements of the foregoing declaration are true and correct, according to the best of his knowledge, information, and belief; " and the appended lists contained the following names: "Illegal votes received, with the names of the persons offering them—No. 1, J. C. Trawick; No. 2, B. F. Temple; No. 3, William J. W. Brown; No. 4, Sidney S. Pennington; No. 5, .M. R. Trawick; No. 6, Alfred Hutchinson; No. 7, Frank Lewis; No. 8, J. C. Flinn; and No. 9, —— Bracks. Legal votes rejected—No. 1, offered by John Meadows; with divers others, both of votes illegally received, and of votes illegally rejected, a list of which will be appended and furnished to the defendant, as soon as ascertained."

A demurrer was interposed to this statement, on account of the uncertainty and insufficiency of its allegations, but was overruled by the court; and the defendant Wall then filed several pleas, denying the truth of the averments contained in the contestant's statement, and alleging that the inspectors rejected several legal votes for Wall which should have been received, and, on the other hand, received and counted several illegal votes for the contestant which should have been rejected. The contestant demurred to the several pleas which averred the reception of illegal votes for him, and the rejection of legal votes for Wall, and moved the court to strike them out, because no notice had been served on him that evidence would be offered in reference to such votes; but the court overruled the demurrer and motion, and issue was then joined on all the pleas. The contestant also asked

for a continuance, after the overruling of his demurrer, on the ground of surprise, and because he was not then prepared to go into a contest respecting the legality of the votes mentioned in the special pleas, of which no notice had been served on him; but the court refused to grant it, and the contestant excepted.

The parties then proceeded to offer evidence as to the matters in issue; the contestant reserving numerous exceptions to the rulings of the court during the trial, of which it is only necessary to notice such as are decided by this court.

"Upon a recount of the ballots of precinct No. 9, it appeared that Wall only received 48 votes, instead of 49, as was certified by the managers of said precinct to the sheriff; and upon a recount of the ballots at precinct No. 3, Wall also lost one vote. By recount of the ballots of precinct No. 7, Wall gained one vote, and, at precinct No. 5, gained three votes, while the contestant lost one; but, by reference to the poll-lists from said precinct, it appeared there were only 352 names upon any of said lists, while there were 356 ballots in the box, upon twelve of which there was not the name of either candidate for sheriff. There was one ballot on which the name of Griffin seemed to have been marked out with a pencil, and the name of Wall written very lightly; and there were two tickets, which appeared to be parts of one and the same ticket, with the name of 'candidate for sheriff' on one part only, and the word 'senator' on the other. The contestant then offered to prove, by said poll-lists and ballots, that one W. J. W. Brown, whose vote was contested, voted at said election; but the defendant Wall objected to the introduction of the ballots, on the ground that no evidence had been introduced to show that Brown was an illegal voter. The court sustained the objection, and the contestant excepted." The contestant afterwards proved, by one of the managers of the election at precinct No. 1, that said Brown voted at said election; and other proof being introduced, showing that he had removed to Coosa county about the 1st May preceding the election, the probate judge rejected his vote.

To prove the residence of Alfred Hutchinson, the legality of whose vote was contested, the contestant asked a witness, " if he knew where said Hutchinson had formerly resided ;" to which the witness answered, " that he only knew from said Hutchinson's declarations." The court excluded the proof of these declarations, and the contestant excepted. The contestant then offered to prove " what was the general reputation amongst said Hutchinson's neighbors, as to his former residence ;" but the court rejected the proof, and the contestant excepted.

The contestant disputed the legality of the vote of J. C. Flinn, and proved that he had gone to Kansas territory, with Col. Buford's company of emigrants, in June, 1856, and was seen at Westport, Missouri, in the latter part of September, 1856. He also offered to prove the declarations of said Flinn, " on the day of election, relative to his citizenship and residence in Kansas ;" and reserved an exception to the rejection of the declarations as evidence. Flinn himself testified, " that he left Alabama with Buford's emigrants, and went with them as far as Westport, Missouri ; that he went into Kansas alone, and returned to Wetumpka on the 2d January, 1857 ; that he did not leave Alabama with the intention of abandoning his residence here, nor of making Kansas territory his residence ; that, by 'emigrating,' he meant that he emigrated there, and emigrated back again—that is, he went there, and came back ; that he went to look at the country, and did not locate any pre-emption." The record does not show whether the vote of Hutchinson was received or rejected by the probate judge.

A great deal of evidence was introduced by both parties relative to John Meadows, whose vote was rejected by the managers of the election ; but the opinion of this court, in view of the fact that it does not appear for which one of the two candidates he would have voted, renders this evidence entirely immaterial.

" The contestant introduced one Pennington as a witness, who testified, that he resided in Montgomery county until last January, paid taxes there last year, and gave in his taxes there this year, but did not know whether the

11

assessor took down his poll or not; that his poll was not on the list which he gave the assessor, but it was not usually on said list, and the receipt for his taxes usually mentioned his poll with other items; and that he had resided in Coosa county since January last. The contestant, having called the attention of said Pennington to the time and place at which he had a conversation with one John Loyall, upon the subject of his taxes and assessing the same in Coosa county, offered said Loyall as a witness to contradict the statements of said Pennington relative thereto. The court sustained an objection to the testimony of Loyall on this point, on the ground that the contestant himself had introduced Pennington as a witness, and, therefore, could not discredit him; and to this ruling of the court the contestant excepted."

The residence of Frank Lewis, the legality of whose vote was contested, was in issue. One of the contestant's witnesses testified, "that said Lewis, to the best of his knowledge, lived on section 12, in township 18, range 19; and another, that he lived on section 12 or 13." The contestant then proposed to prove by one Letcher, who was a brother-in-law of Lewis, "that when said Lewis was about to remove to the place where he now lives, which was about two years ago, he said he was moving to Montgomery county, and had since told him that he lived in Montgomery." The court excluded this evidence, on the defendant's objection, and the contestant excepted.

The contestant proved, by one Glenn, that J. C. Trawick, who was admitted to have voted for Wall, "left his father's house in Coosa county, some time in March, and did not return until about the last of July. Contestant then asked the witness, if he knew where said Trawick was during his absence from his father's house; to which the witness replied, that he did not know of his own knowledge, but had seen letters purporting to have come from him. The contestant then proposed to prove where said letters were postmarked, to whom they were addressed, and in whose possession they were. The court excluded this evidence, on the defendant's objection, and

the contestant excepted. Said Trawick was then intro-
duced by the contestant, and testified, that he left his
father's residence in Coosa county, which was his resi-
dence, some time in March, and went to Shelby county,
where he went to work, and remained there until the 22d
July; but said witness further stated, that he did not
leave his residence in Coosa county with the intent to
abandon it, and that he only had a contract for business
by the month, and not by the year."

"The contestant also made a motion, which was argued
at the hearing, to reject two of the votes which Wall had
gained by the recount of the ballots at the Nixburg pre-
cinct, on the ground that there were not so many names
upon any of the poll-lists at said precincts as there were
ballots in the box, and that these two ballots were, as he
contended, wholly unaccounted for and unexplained.
The court overruled said motion at the hearing, and the
contestant excepted."

The court also allowed the defendant, against the con-
testant's objections, to adduce evidence in reference to
legal votes for himself which the managers had rejected,
and illegal votes for the contestant which they had receiv-
ed. The ground of objection by the contestant to this
evidence was, that the defendant had not served notice on
him that the legality of these votes would be controverted.
Exceptions were reserved by the contestant to the admis-
sion of this evidence.

The probate judge, on recounting the votes, decided
that Wall was legally elected sheriff of the county. The
contestant claimed an appeal to the circuit court, and
there insisted that the trial should be had *de novo*. The
court refused his motion, and held that the trial must
there be had on the record sent up by the probate judge.
The contestant reserved an exception to this ruling of the
court, and proceeded to assign errors on the record, em-
bracing all the rulings of the probate judge, seventeen in
all, to which he had reserved exceptions. On these
assignments of error, the circuit court affirmed the judg-
ment of the probate judge. From this judgment the con-
testant now appeals, and here assigns as error the refusal

of the circuit court to grant him a trial *de novo*, and all the rulings of the probate judge which were affirmed by the circuit court.

L. E. PARSONS, for appellant.

ELMORE & YANCEY, *contra.*

STONE, J.—We do not entertain a doubt of the correctness of the decision of the circuit court, in denying to appellant the right to a trial *de novo* in that court. The sections of the Code which give the right of appeal, first from the probate to the circuit court, and afterwards from the circuit to the supreme court, are, in substance, identical. We know of no principle of construction which will authorize us to discriminate between the effect of these several appeals.—Code, §§ 334, 335, *et seq.*

Section 337, which relates to each of these classes of appeal, authorizes "the clerk of the *appellate* court, if the decision is against the appellant, [to] issue execution for the *costs of the appeal*, against such securities." The phrase, "costs of the appeal," is very inappropriate to convey the idea of costs of a trial *de novo.* They express with precision the meaning of the legislature, if the appeal to the circuit court be triable on the record alone.

Another reason : Section 317 of the Code provides, that when the judge of probate "is incapacitated, under section 560 of this code, from trying such contests," the trial must be transferred to the circuit court. Sections 318 and 319 of the Code direct how such trial is to be conducted, and, among other things, authorize the circuit court, "for cause, to continue such contest to a day after the termination of the circuit, or to the next succeeding term." Now, the language of these sections clearly makes it the duty of the circuit court, in cases where the judge of probate is incapacitated to try the case, to hear the testimony, and try the facts ; and it may even adjourn the trial to a day in vacation. Section 334, and those following, contain no such provisions, nor can any such be implied from them.

[2.] We think the statement filed by the contestant in

Griffin v. Wall.

this case is substantially sufficient.—Code, §§ 273, 279, 280. The notice was also sufficient, so far as the action of the contestant is concerned.—§ 277. True, the statement would have conformed more strictly to the statute, if it had affirmed in terms that Mr. Wall had been *declared elected.*—§ 273. The averment is, that Mr. Wall was the successful candidate, which is substantially the same thing.

[3.] A question, very important in practice, arises upon the construction of sections 275 and 277 of the Code. Section 275 clearly contemplates, that in a contest on account of illegal votes received, or legal votes rejected, the real issue is, whether the party whose election is contested, or some other person voted for, received the greater number of legal votes, or would have received the greater number, if all the legal votes offered had been received and counted. Under this section, both parties are, or may become, actors. Section 277 declares, that "no testimony must be received of any illegal votes, or the rejection of any legal votes, in any contested election, unless the party contesting has given to the adverse party notice in writing of the number of illegal votes, and by whom given, or the number of legal votes rejected, and by whom offered, which he expects to prove on the trial." Section 278 fixes the time of legal notice; namely, "at least ten days before the trial."

The literal import of the language above copied will exclude all evidence as to the legality of votes given or rejected, unless notice be given. It does not discriminate between votes given or offered for either the one or the other candidate. The language is general—"*no testimony must be received.*" The contingency, on which this prohibition is to be inoperative, is, that *the party contesting* has given notice to the adverse party. A literal construction of this language would require, that the party contesting shall give notice to his adversary of *the votes*, as to the legality of which that adversary is to be permitted to offer testimony. A statement of this proposition is its refutation. We think we carry out both the spirit of the law, and the intention of the legislature, by holding that each

party, when he becomes actor, shall give notice of the votes given to his competitor, which he proposes to assail as illegal, and of the legal votes offered for himself and rejected.—Petty v. Walker, 10 Ala. 379 ; Stewart v. Hargrove, 23 Ala. 429.

[4.] The question last above considered does not justify a reversal of this case. No vote which had been cast for Griffin appears to have been rejected, and no vote which had been offered for Wall and refused, was received and counted on the trial of the contest before the probate judge. The decision of the probate judge on this question was, then, error without injury.—Dunlap v. Robinson, 28 Ala. 100 ; Smith v. Martin, 18 Ala. 819.

[5.] We do not propose to consider the correctness of the several rulings of the probate judge on the pleadings, further than to say he correctly overruled the demurrer to contestant's statement. The Code does not require that the person, whose election is contested, shall plead to the statement, and we think no plea necessary. If he desire to offer testimony, as to votes which he alleges were illegally given to an opposing candidate, or as to legal votes offered for himself and rejected, he secures that right to himself by serving notice according to sections 277 and 278 of the Code.

The record does not inform us of the final ruling of the probate court, except in a few particulars, and in the general result. We deem it unimportant to decide each and every point that was raised on the admissibility of evidence. We will lay down a few rules which we think will be sufficient to direct the probate judge on another trial.

[6.] The questions raised on the recount of the votes at the Nixburg precinct, are not so clearly and fully presented as that we can safely pronounce upon them, in all their bearings. Under the Code, (§§ 209, 210,) if the inspectors and clerks do their duty, in recording the *names* of the voters, and the *number* on the poll-lists, and the *number* on the ballots, the means of correcting errors and mistakes in counting out the ballots will be readily furnished to the court trying the contest. His duties are

pretty clearly shadowed forth in sections 222 and 223 of the Code. We do not say the court should confine his investigations to what appears on the poll-lists and ballots. He certainly should hear any legal evidence of errors or mistakes in either. In the absence of explanations, however, he should be controlled by them. In case of discrepancy between the number of names on the poll-lists and the number of ballots found in the box, he should endeavor, by an examination of the several ballots, and a comparison of them with the poll-lists, aided by any other legal evidence that may be offered, to ascertain the correct number of the *legal votes* given at that precinct. This is his highest duty. If more ballots are found in the box than there are names on the poll-list, he should examine and compare the numbers on each. If ballots are found without numbers, he should, if possible, ascertain whether the supernumerary ballots are part and parcel of some other ballots properly numbered, and severed from them by accident or design. If, on hearing the entire proof, there are ballots for which there are no corresponding voters on the poll-lists, or established by other competent testimony, such ballots must be rejected. We add further, that under the Code, if after hearing all the testimony, and proper examination of the poll-lists and ballots, there remain an irreconcilable conflict between the number of voters and the ballots, the number shown by the poll-lists is entitled to more credit than the unexplained number of ballots found in the box. In announcing this as our conclusion upon the sections of the Code, we feel it our duty to state that, we have carefully examined the case of The State v. The Judge of the 9th Circuit, 13 Ala. 805. That case presented the simple question of the relative weight as evidence of the *ballots* found in the box, and the *tally-lists* or *sheets* made by the clerks in counting out. The poll-lists were not referred to, in that portion of the opinion which is relied on by appellee.—13 Ala. p. 815. The statement of the facts, as made by the reporter, and the portion of the opinion we refer to, show this to be the case. The poll-lists stand on different ground. Unexplained, they have more sanc-

tions of verity, than ballots in the box, for which there are no names or numbers on the poll-lists.

[7.] The bill of exceptions recites, that it contains all the evidence. Some of the supernumerary votes found in the box at Nixburg are not sufficiently accounted for, as far as we have been able to understand the record. These votes appear to have been counted for Mr. Wall; and, as the facts appear to us, this was an error to the prejudice of Griffin. We are not informed as to the number of votes found for either of the candidates on the final count, and hence we are not able to say that this error was harmless. On another trial these questions may be made plain. See Mims v. Sturdevant, 23 Ala. 664.

The testimony found in this record, which relates to the vote offered by Meadows, is so unsatisfactory and conflicting, that we are unable to say there was error in rejecting it. It is left in extreme doubt, for which of the candidates he would have voted, if he had been allowed the privilege.

[8.] The rules to be observed in reference to questions of disputed domicile or residence, are considered and settled in the cases of The State v. Hallet, 8 Ala. 159; State ex rel. v. Judge of the 9th Circuit, supra; Boyd v. Beck, 29 Ala. 703. The principles settled in those cases will enable the probate judge to determine all questions of this kind likely to arise on another trial. The letters received from Trawick, while he was in Shelby county, tended by their post-marks to show where he then was. Evidence of them ought to have been received. If, however, the evidence of Trawick be believed, that he went to Shelby for a temporary purpose only, with the intention of returning, he did not thereby forfeit his domicile.

[9.] The court rightly rejected the testimony of Loyall, offered to contradict the testimony of Pennington. Pennington had been introduced by contestant as his witness, and he could not impeach his own witness.

[10.] Reputation, or common report, of either the present or former residence of any voter, is not legal evidence. Neither are declarations of a party, that he has lived in a particular place or county, evidence that such is the fact,

when the question arises in a contest between other persons. What a party says on leaving home, or immediately previous thereto, or while on a journey, explanatory of the act or object of leaving home or performing such journey, is admissible evidence as part of the *res gestæ,* whenever the act itself is material evidence. So, as a general rule, whenever in any controversy, it is permissible to prove any act of a third person, the declarations of such third person, accompanying the act, and explanatory thereof, are also admissible. What degree of credit the accompanying declarations shall receive, must depend on their reasonableness and consistency.—Pitts v. Burroughs, 6 Ala. 733; Stallings v. Newman, 26 Ala. 300; Gillespie v. Burleson, 28 Ala. 551; Scott v. The State, 30 Ala.

The judgment of the circuit court, affirming the decision of the probate judge, is reversed; and this court, proceeding to render such judgment as the circuit court should have rendered, doth hereby order, adjudge, and decree, that the judgment of the probate court is reversed, and the cause remanded to the probate judge of Coosa, to be proceeded in according to the principles of this opinion.—Code, § 3034.

Let the costs of this appeal, and of the appeal to the circuit court, be paid by the appellee. The clerk of this court will certify this reversal to the circuit court, and to the probate judge of Coosa.