# Hudmon *et al. v.* Slaughter.

*Mandamus to Municipal Board, in matter of Election.*

1. *Municipal election; duties of board in counting votes and declaring result—whether judicial or ministerial.*—Under the charter of the city of Opelika approved March 26th, 1873 (Sess. Acts 1872-3, p. 352), the third section of which provides that the votes cast at an election for mayor and aldermen "shall be returned to the existing mayor and council, whose duty it shall be, within five days after the election, to count the votes, and compare the poll-lists with the registration lists, and reject all votes cast by persons whose names do not appear registered as hereinafter provided, and to declare by publication in a newspaper published in Opelika, and by posting notices in at least four public places, the name of the person having received the greatest number of registered votes for mayor, and the names of the six persons having received the greatest number of registered votes for aldermen;" and by which it is further declared that the members of the board, who, in a subsequent section, are called a "board of supervisors," are guilty of a misdemeanor, and punishable criminally by fine and imprisonment, for failing or refusing to discharge these duties; and express provision is made for contesting the election by proceedings instituted before the judge of probate; the powers of the board, in counting the votes, and declaring the result, are purely ministerial, and in no sense judicial.

2. *Same; powers of board of canvassers.*—Where a board of canvassers, or supervisors, are authorized and required to count the votes cast at an election, compare the poll-lists with the registration lists, reject all votes cast by persons whose names do not appear registered, and declare the result; while they must, of necessity, determine whether the returns before them, which they are required to cast up, are genuine and intelligible, and substantially authenticated as required by law, they have no power to go behind the returns, to investigate charges of fraud or irregularity, nor to reject votes on account of such fraud or irregularity.

3. *Same; mandamus to board of canvassers.*—The writ of *mandamus* will be awarded to a board of canvassers, at the instance of a person claiming to have been elected to a municipal office, to compel them to discharge the ministerial duties of counting up the votes and declaring the result; and they can not, in answer to the writ, or avoidance of it, set up irregularities in the returns, or frauds in the conduct of the elections, however gross or monstrous in their character.

4. *Same; power of board to judge of election and qualification of their own members.*—The power given to the mayor and aldermen, by a provision in the charter of the city, to judge and decide as to the election and qualifications of their own members, applies only to a contest between two or more members claiming membership by election to the same board, and does not enlarge the power and duty, conferred by other sections of the charter, to act as supervisors of the election of their successors, in counting the votes and declaring the result.

5. *Same; what are "registration lists."*—The "registration lists," with which the board are required to compare the poll-lists, rejecting "all votes cast by persons whose names do not appear registered," are the original book, in which are written the names of all persons registered as voters, with the prescribed oath printed at the top of each page, and

[Hudmon et al. v. Slaughter.]

the alphabetical copy thereof which the clerk is required to make, and which is "to be placed in the archives of the city for safe-keeping;" and the court holds, from an inspection of these books, that they show a substantial registration, as required by the charter, and are sufficiently intelligible and in due form to enable the board to count the votes and compare the poll-lists with them.

APPEAL from the Circuit Court of Lee.
Tried before the Hon. H. D. CLAYTON.

WM. H. BARNES & SONS, for appellants.—(1.) The power to examine and scrutinize into the election of their members is "incident to all elective bodies."—1 Bay, S. C. 437. (2.) By express provision in the city charter of Opelika, the power is conferred upon the mayor and aldermen to judge of the election and qualifications of their members, or persons claiming to be such.—Acts 1872–3, p. 351, § 13. "This confers upon the board a discretion which can not be controlled by the courts. Upon the board is conferred the power to judge, not only of the qualifications, but of the election of its members, with the power to order new elections."— *Vicksburg v. Rainwater*, 47 Miss. 547. (3.) The city council having exercised this power, and their action being judicial in its nature, *mandamus* does not lie to control their judgment.—High on Extra. Leg. Remedies, § 57; McCrary on Elections, §§ 331–3; 2 Dillon Mun. Corp. § 669; 5 Hill, 616; *Davidson v. Washburn*, 56 Ala. 597. This last case is in conflict with *Thompson v. Circuit Judge* (9 Ala. 338), *Spence v. Judge* (13 Ala. 805), and *Wammack v. Holloway* (2 Ala. 31), but is well sustained by authority. (4.) By the provisions of the charter, to become a legal voter at a city election, the person must not only have the qualifications of other legal voters, but his name must have been duly registered on the registration lists, and the prescribed oath must have been administered to him by the clerk. The oath was essential to legal registration, and legal registration was necessary to entitle one to vote. If no registration lists had been made or kept, what would have been the duty of the council? They could not compare the poll-lists with the registration lists, because none were kept; and they could not declare the name of the person receiving the greatest number of registered votes, because there were no registered voters. In such case, they must judge of the election, and must decide that there was no election, because no legal votes were polled. Cooley on Const. Lim. 602; 16 Mich. 342; 44 Mo. 346; 46 Mo. 450. (5.) It makes no material difference, in this repect, whether the council should use the original book, as held by the court below, or the alphabetical list prepared by the clerk for the archives. No certificate is provided by the law for

[Hudmon et al. v. Slaughter.]

either, as is prescribed in State elections, and neither is conclusive on the council; and no certificate being required by law, any certificate appended by the clerk would amount to nothing. This shows that the power of the council to inquire into and investigate the registration remains unrestricted, and they must at least inquire of the clerk whether the book has been kept as by law required; and when inquiry must be made, evidence taken, and judgment and discretion exercised, the power is judicial, not ministerial.—*Ex parte Thompson*, 52 Ala. 99. (6.) The old charter, which was repealed, conferred full and complete powers in this regard.—Sess. Acts 1869-70, p. 323; *Echols v. Dunbar*, 56 Ala. 136. The new charter differs from the old only in its directions as to a contest, which pre-supposes an election—that is, a valid and legal election, the result of which is contested. Before a contest can be initiated, the result of the election must be announced by the supervisors (who are the city council), and the contestant must make oath that he believes he has been duly and legally elected. When there has been no legal election, it is the right and duty of the council so to declare; and there can be no contest, because there has been no election. (7.) But, whether this construction of the charter be correct or not, it is certain that the canvassers (that is, the city council) have the power to determine whether the returns of the election are genuine, intelligible, and substantially authenticated as required by law; and this power is judicial.—High on Extra. Leg. Remedies, § 56; *Bloxham v. Canvassers*, 7 Florida, 73; *Clark v. McKenzie*, 7 Bush, Ky. 527; *Arberry v. Beaver*, 6 Texas, 457; McCrary on Elections, § 331, p. 286. (8.) The court below properly held, that the original registration book, not the alphabetical list prepared by the clerk, was the proper one with which the poll-lists should be compared; and it is submitted to this court for inspection.

GEO. P. HARRISON, and GEO. W. HOOPER, *contra.*—The duties required to be performed by the appellees, as the old city council, are those ordinarily required of canvassers of elections; and they are ministerial, not judicial duties. They have failed and refused to perform these duties, and right and justice demand that they should be compelled to perform. *Mandamus* is the appropriate, and the only remedy.—*Spence v. Judge, &c.*, 13 Ala. 805; *Thompson v. Judge, &c.*, 9 Ala. 338; *Hill v. The State*, 1 Ala. 559; *Wammack v. Holloway*, 2 Ala. 31; Cooley's Const. Lim. 621; High on Extra. Legal Remedies, §§ 55, 60–63; *State v. Steers*, 44 Mo. 223; *Kister v. Cameron*, 39 Indiana, 488; *State v. County Judge*, 7 Iowa, 186, 390; *State v. Hilliard*, 29 Ill. 414; 7 Bush, Ky. 523; Moses on *Mandamus*, 90; Brightley's Lead. Cases, 303–06; McCrary on Elections,

[Hudmon et al. v. Slaughter.]

§§ 84–5, 321, 328, 338; *Rather v. Limestone Co.*, 48 Ala. 433.

SOMERVILLE, J.—This is an application for the writ of *mandamus* by the petitioner, Slaughter, who claims to have been legally elected alderman, as a member of the board of Mayor and Aldermen of the city of Opelika, at an election held under the charter of the city on March 7, 1882. The relator alleges the failure and refusal of the municipal board to *count the votes*, as shown in the returns made to them, and to *certify the result*, as was their duty under the charter; and the prayer of the petition is to compel the performance of this duty.

The answer of the respondents admits their refusal to count, and seeks to justify their action under a resolution of the board declaring the election void, and ordering a new election, on account of alleged irregularities and frauds, both in the registration and in the election. The main reasons assigned are, the failure of the city clerk, in his official capacity as registrar, *to administer the oath* to a vast majority of the voters, as he was required to do by the charter, and the alleged *insufficiency and imperfections of the registration book, or lists*, kept by the clerk, with which the city board was required to compare the poll-lists, in order to arrive at the result. The Circuit Court granted the peremptory writ on the final hearing, and the respondents appeal from this judgment.

In our judgment, but two questions are involved in the case: *first*, the nature of the duties imposed on the board by the charter, as being purely ministerial or judicial; *secondly*, the sufficiency or insufficiency in form of the registration lists and election returns, from an examination of which the respondents were authorized to certify the result.

It is insisted by the appellants, that the charter conferred on them judicial, and not merely ministerial functions, in this matter. This claim is based upon the construction of section 3 of the charter, as found on page 352, of the Acts of 1872–73, and approved March 26, 1873. This section, after fixing the qualification of voters in the city election, and making registration in a book kept by the city clerk a pre-requisite, declares as follows: "That the votes" [cast for the several candidates for mayor and aldermen] "shall be returned to the existing mayor and council, whose duty it shall be, *within five days after the election*, to *count the votes, and compare the poll-lists with the registration lists*, and *reject all votes cast by persons whose names do not* APPEAR *registered* as hereinafter provided; and *to declare* by publication in a newspaper published in the city of Opelika, and by posting notices in at least four public places, the *name of the person having received the greatest number of*

*registered* votes for mayor, and the names of the six persons having received the greatest number of registered votes for aldermen at said election."

It is perfectly clear to our mind, that the duties intended to be imposed on the board by this section are ministerial, and in no sense judicial—that they are constituted mere canvassers, or supervisors of the election returns, and have no authority to exercise the judicial power of investigating or determining the validity of the election.

This view becomes apparent by comparing the former with the present charter, by which it is superseded. A manifest change has been made in the nature and extent of the powers of the board, as regards the whole subject of municipal elections. The former charter expressly constituted the city council to be "*judges* of all [such] elections," and reposed in them "full power to *determine all matters* in relation thereto, and ascertain *the legality of votes ;*" and "to *reject all illegal votes,* and count only such as are legal;" and, in fine, to take testimony, and examine witnesses, with the view of deciding the result. These powers are fully commensurate with those possessed by judges authorized to sit and determine regular election contests.—Acts 1869–70, p. 323, § 3 ; *Echols v. The State, ex rel. Dunbar,* 56 Ala. 131. Why did the legislature abrogate these powers, which were so clearly expressed, and substitute for them the one simple duty of counting the votes, and declaring the result from a mere comparison of the registration and poll-lists ? Can we convict them of doing a useless thing, by which they meant nothing, leaving out of view other potent facts disclosing an obvious intention to the contrary ? That the duties of the board, furthermore, are ministerial, is plain from the additional fact, that the charter declares the board to be guilty of a misdemeanor, and *punishable criminally,* by fine and imprisonment, for failing or refusing to discharge these duties, as required.—Acts 1872–73, p. 354, § 4. It is not customary to punish any officer for failure or refusal to discharge a judicial duty, as the discretion devolved carries with it the right to determine whether to perform or not to perform in each adjudged case. Nor can it be supposed, either, that the charter would require the respondents to count and declare the result within so brief a space as *five days* after the election, if the intention was to authorize an investigation of irregularities or frauds, other than such as appear on the face of the returns and papers before them. The legislative intention is further evinced in this matter by an express provision, declaring that the judge of probate shall have jurisdiction of all proceedings inaugurated for the purpose of *contesting* such elections, and that the issues formed shall be tried by a jury of disinterested

[Hudmon et al. v. Slaughter.]

persons—thus reposing elsewhere a power taken away by the new charter from the municipal board.—Acts 1872–73, § 10, p. 355.

It is noticeable, also, that the respondents are designated in section 10 of the charter, as a "board of *supervisors.*" The ordinary duties of such officers are universally recognized as being purely ministerial. They are simply to make a correct statement of the votes cast for each candidate, from the face of the returns, and to ascertain by arithmetical computation who has the majority, and so to certify, or declare, as the statute may require.—Code, 1876, §§ 291–2. It is settled, without controversy, that mere canvassers possess no judicial or discretionary powers, and can not go behind the returns.—High on Extr. Rem. §§ 60–63; McCrary on Elections, §§ 83–84; Brightly's Elec. Cases, p. 306, *note ; State, ex rel. v. Judge of 9th Circuit,* 13 Ala. 805; *State, ex rel. Thompson v. Circuit Judge,* 9 Ala. 338; Cooley on Const. Lim. 621, 784.; Moses on *Mandamus,* p. 90; *Kister v. Cameron,* 39 Ind. 488; *State v. Steers,* 44 Mo. 223; *Clark v. McKenzie,* 7 Bush (Ky.), 523.

It is true that boards of supervisors, or canvassers, must of necessity determine, as a preliminay question, whether the returns before them, which they are required to cast up, are "genuine and intelligible, and substantially authenticated as required by law"—or, in other words, whether such documents are in fact returns or not—and the power thus to determine is often said to be in its nature *quasi*-judicial.—High on Extr. Rem. § 56; McCrary on Elec. §§ 331, 82–83; *People v. Head,* 25 Ill. 328. Yet it must always be for the courts to determine, in each given case, whether there is any scope for the operation of this principle, and whether it be *bona fide* invoked.

It is well settled, however, that in a proceeding by *mandamus,* to compel a board of canvassers to perform their official duties, they can not set up irregularities in the returns, or frauds in the conduct of the election, however gross or monstrous in their character. These are not matters for the considerations of courts, in applications of this kind, at least where another forum has been provided for the contest of the election, by which a complete and adequate remedy is furnished. High on Extr. Rem. § 56; McCrary on Elec. § 331; *State v. Jones,* 19 Ind. 365; *People v. Head,* 25 Ill. 328; Brightly's Elec. Cases, p. 306, *note.* The basis of the principle lies in the fact, that a canvassing board has no power to discard or reject returns of votes, which on their face appear genuine and regular in form, on the ground of frauds committed in the election. *Lewis v. Commissioners,* 22 Amer. Rep. 275 (s. c., 16 Kan. 102); *Kister v. Cameron,* 39 Ind. 488, *supra.* In the case of the *Attorney-General v. Barstow,* 4 Wisc. 749, it was said by the

court, that canvassing officers were authorized only "to add up and certify by calculation the number of votes given for any office;" and it was added, that "they have no discretion to hear and take proof as to frauds, even if morally certain that monstrous frauds have been perpetrated."

That the writ of *mandamus* will be awarded to compel the discharge of such of these duties as are merely ministerial, is uniformly admitted by all the authorities.—Moses on *Mandamus*, p. 90, and cases above cited; High on Extr. Rem. § 56.

It is almost too obvious for argument, that the respondents can derive no aid in this proceeding, from the clause in the city charter which constitutes them judges of the election and qualifications of their own members. This can apply only to a contest between two or more candidates claiming membership by election to the same board. To permit the board to determine the fact of their election, as against another contesting board, would be to constitute them judges in their own cases; which has always been considered so monstrous a perversion of justice, as that it has been often asserted that the proverbial omnipotence of Parliament was entirely inadequate to its accomplishment.—*Davy v. Savadge*, Hobart, 87; 12 Mod. 687.

We conclude, in view of the above considerations, that the power reposed by the General Assembly in the respondents, under the provisions of the third section of the city charter, are of a ministerial, and not a judicial nature.

We next consider the other question, as to the sufficiency in form of the registration book and list, and the other election returns, from an examination of which the city council were authorized to certify the result. Section 11 of the charter provides, in reference to these matters, that it shall be the duty of the clerk of the city council "to keep a well-bound registration book, in which shall be registered the names of all persons *who claim the right to vote* at any city election;" that it shall be his further duty "to have written or printed, at the top of each page of said registration book, the following oath: 'I do solemnly swear, that I am over the age of twenty-one years, and legally entitled to vote in the State of Alabama for members of the General Assembly, and have been a resident citizen of the city of Opelika for the last three months;'" which oath is required to be administered by the clerk, or his assistants, to every person who registers his name in the book, and the name of the person registered is required to be written under this oath. *Any person*, who makes application, is authorized to register, "without delay or hindrance." The clerk is also enjoined, within three days after each city election, to record in a book, in alphabetical order, the names of all persons registered

[Hudmon et al. v. Slaughter.]

to vote at said election, said book to be placed in *the archives of said city* for safe-keeping."

It is our opinion that the *original registration book* and this *alphabetical copy* of it constitute the "registration books" referred to in the third section of the charter, with which the board are required to compare the poll-lists. There is no express provision requiring the clerk to affix a certificate to this alphabetical list. The former, we apprehend, may either be implied as a convenient method of identification, or else it may be considered entirely unnecessary, in view of the fact that the clerk, who makes it, is an officer of the body in whose archives it is deposited, and it thereby becomes a *quasi* municipal record.

The original registration book is before us, for our personal inspection, having been transmitted to this court in accordance with the 20th Rule of Practice, that we might examine its sufficiency, in connection with the record. It is a well-bound book, containing the names of between six and seven hundred persons, signed beneath the proper oath written at the top of each page, in accordance with the charter requirement. Some erasures of names appear in pencil, and others by pen.

If there had been no registration whatever, it may be that the election would have been absolutely void, and the failure on the part of the respondents to discharge the duties in question would have been justified.—Cooley Const. Lim., 4th ed. 758 [602]. But it is well settled, that mere informalities in a registration, where one is made, will not vitiate it, and canvassers can not, on this account, either reject votes, or refuse to count those which appear to have been registered.—*State v. Baker*, 38 Wis. 71. Canvassers, as we have seen above, have no authority to go behind the face of the returns, and other documents before them, in order to adjudge questions of either irregularity or fraud. They can only reject such returns as are void on their face, as being so destitute of essential form as to render them unintelligible.—*State v. State Canvassers*, 36 Wis. 498; *Phelps v. Schroeder*, 26 Ohio St. 549.

It is our judgment, that this registration book, taken in connection with the alphabetical copy of it identified by the city clerk's authentication, constitutes, on the face of it, sufficient evidence of a substantial registration as required by the charter; and it is sufficiently intelligible, and in due form, to enable the respondents to count the votes and compare the poll-lists with them. This is a ministerial duty, and they have shown no lawful excuse for refusing its performance. They had no authority to declare the election void. The failure of the clerk to administer the oath to each person applying for registration, as he clearly should have done, can not be investigated by them in their capacity as canvassers. The flagrant and very gross

[Murphree v. Whitley.]

frauds, which seem to have been practiced, alike in the registration and election, are matters for consideration by another tribunal, and can not be alleged by way of answer to this petition for a *mandamus*.

The judgment of the Circuit Court, granting the prayer of the petition, is affirmed. It is corrected, however, so as to authorize the respondents to look to both the original registration book and the alphabetical copy of it made by the clerk, in addition to the other returns made by the managers.